CLAYTON SIMMS (8321)
Attorney for Defendant
Clayton Simms, LLC
9 Exchange Place, Suite 600
Salt Lake City, Utah 84111
Telephone: 801.359.0404
Fax: 801.534.19484
clayton@claytonsimms.com

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA, | : | MOTION TO SUPPRES STATEMENTS: *MIRANDA* |
|---|---|---|
| Plaintiff, | : | |
| v. | : | 1:17-cr-00084 |
| LAMONT HOOKS, | : | JUDGE DEE BENSON |
| Defendant. | | |

The Defendant, Lamont Hooks, by and through counsel of record hereby moves this Court to suppress his statements pursuant to DUCrim R 12.

Mr. Hooks respectfully move this Court to suppress all evidence, all discussions and/or conversation between Mr. Hooks and law enforcement personnel, which includes but is not limited to statements to Ogden Police Officer Jaren Nielsen and/or Ogden Police Detective J. Beck.

1

## STATEMENT OF FACTS

1. On November 16, 2017 at approximately 3:30 p.m. a vehicle driven by Autumn Larsen was stopped for a failure to signal traffic violation. Mr. Lamont Hooks was a passenger in the stopped vehicle.

2. Ogden Police Officer Jared Nielsen stopped the vehicle and upon approaching the vehicle the officer "detected the odor of fresh marijuana coming from the vehicle". Ogden Officer Jared Nielsen's police report, Bates No. RPT-WMSF-0042.

3. Both Autumn Larsen and Lamont Hooks denied there was any marijuana in the vehicle. "I (Officer Nielsen) asked Autumn and the passenger, Lamont, if there was any marijuana in the vehicle and they said that there was not. I got Autumn's information and called for another unit. Officer Pullum arrived to assist me." Ogden Officer Jared Nielsen's report, Bates No. RPT-WMSF-0042.

4. Autumn Larsen and Lamont Hooks exited the vehicle and Officer Pullum stayed with them as a dog detection dog (Odin) was deployed. Ogden Officer Jared Nielsen's report, Bates No. RPT-WMSF-0042. "I had Autumn and Lamont exit the vehicle…Autumn had a large dog that she took with her. I (Offer Jared Nielsen) deployed PSD Odin on the exterior of the vehicle. Odin went to the driver's side window that Autumn had

left open. Odin jumped into the interior of the vehicle without being commanded to. Odin then gave a positive indication to the odor of narcotics on a purse that belonged to Autumn. I returned Odin to my patrol vehicle." Ogden Officer Jared Nielsen's report, Bates No. RPT-WMSF-0042.

5. Officer Jared Nielsen "looked in the purse and located a white plastic bindle. This had a small amount of brown tar residue on it." Ogden Officer Jared Nielsen's report, Bates No. RPT-WMSF-0042.

6. The search continued and Officer Nielsen "located a small cloth gun case on the back seat. This case had a very strong odor of marijuana on it. I opened the case and found a box of 9 mm ammunition inside. I then located a black handgun on the rear passenger floor board that was concealed into an empty popcorn bag. I then detained Autumn and Lamont. Ogden Officer Jared Nielsen's report, Bates No. RPT-WMSF-0042.

7. Ogden Detective J. Beck arrived at the scene of the stop and assisted. A search of the car continued. A locked safe was located in the truck of the vehicle. The safe was forced open to reveal "heroin, a white crystal residue that appeared to be methamphetamine, glass pipes, a scale and

numerous packing materials." Ogden Officer Jared Nielsen's report, Bates No. RPT-WMSF-0042 &. RPT-WMSF-0043.

8. "Det. Beck interviewed Lamont."  Ogden Officer Jared Nielsen's report, Bates No. RPT-WMSF-0043.

9. Ogden Detective J. Beck reads Lamont his Miranda rights and confronts Mr. Lamont about the drug evidence and the firearm.  Defendant Lamont initially acquiesces to the questions, but then Defendant Lamont revokes his consent to the questioning and invokes his right to remain silent under the U.S. Constitution.   Defendant Hooks invokes his right to remain silent by answering Detective Beck's question of "Is there anything you want to talk about me about?" and Defendant Lamont states "No." Detective Beck does not respect the "no" answer and continues the question Lamont.

10. The questioning continues and Defendant Lamont admits that his DNA would be on the firearm.  "I (Det. Beck) asked Lamont a few times if his DNA would come back on the handgun located in the car and he stated that it would.  Lamont would not further elaborate on why his DNA would come back on the handgun.  Lamont then requested for his attorney to be present. " Ogden Detective J. Beck's report, Bates No. RPT-WMSF-0047.

## ARGUMENT

## THIS COURT SHOULD SUPPRESS ALL STATEMENTS UNLAWFULLY OBTAINED FROM DEFENDANT LAMONT AFTER HE INVOKED THIS RIGHT TO REMAIN SILENT.

The Fifth Amendment to the United States Constitution guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To safeguard this right, the United States Supreme Court held in the landmark case of *Miranda v. Arizona* that a person subjected to custodial interrogation "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. 436, 479 (1964). Statements elicited during a custodial interrogation absent adequate Miranda warnings are inadmissible in a criminal prosecution against the person interrogated. Id. at 478- 79.

Accordingly, this Court must decide (1) whether Defendant Lamont was subjected to custodial interrogation and, if so, (2) whether he first received adequate *Miranda* warnings, and if he consented to questioning.

*Miranda* protections are not implicated unless a person "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. And then only if the person is subjected to "interrogation," that is, "express questioning [or] any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980). "The critical determination [of custody] is whether an officer has restrained the liberty of a person by means of physical force or show of authority so that a reasonable person would not believe he was free to leave." *United States v. Pena*, 920 F.2d 1509, 1515 (10th Cir. 1990). In this case, Lamont was a passenger and the car he was in was stopped. The initial Officer Jared Nielsen claimed he smelled fresh marijuana in the car and called for back-up officers while he searched the vehicle. Mr. Lamont and the driver of the vehicle, Autumn Larsen were separated from the vehicle during the search and dog hit.

As a common law protection of the exercise of the Fifth Amendment right against self-incrimination , the United States Supreme Court set forth some general guidelines in *Miranda v. Arizona,* 384 U.S. 436 (1966). Under *Miranda*, if the government wishes to present in evidence statements which stem from custodial interrogation, the government bears a heavy burden to show that prior to the statements, the defendant was informed of his *Miranda* rights and made a

6

voluntary, knowing and intelligent waiver of those rights before making the statement in issue. *Miranda,* 384 U.S. 444-45. The Court designated the following information to be given to the person prior to custodial interrogation: "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. at 444. Statements taken in violation of the *Miranda* warnings requirement are not admissible in the government's case in chief. *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1977).

Defendant Lamont Hooks was in custody when questioned by the police. Lamont Hooks was read his Miranda rights and initially answered questions, but then when asked do you wish to speak to me about the drugs and guns in the car, Defendant Hooks said no. Officer Nielson should have respected Mr. Hooks' answer of no and stopped questioning.

While *Terry* type investigations allow for limited questioning to confirm an officer's suspicions, *Cordoba*, 910 F.2d at 693 (quoting *Berkemer*, 468 U.S. at 439), prolonged accusatory questioning is likely to create a coercive. In *Berkemer,* the Court advised the practice of giving Miranda warnings at the earliest possible point a police/citizen encounter evolves past a *Terry* stop. Berkemer, 468 U.S. at 431-32 & n.13. The principal advantage of *Miranda* is as a simple line of

7

demarcation which may benefit a suspect but which ultimately benefits law enforcement in the reduction of unnecessary dispute over suppression of evidence. *Berkemer*, 468 U.S. at 430 (quoting *Fare v. Michael C.,* 442 U.S. 707, 718, 61 L. Ed. 2d 197, 99 S. Ct. 2560 (1979)). Where the nature of the police/citizen encounter progresses beyond a short investigatory stop, a custodial environment is more likely. In this situation, *Miranda* rights were read to Hooks and he said no, but that "no" was ignored.

## CONCLUSION

This Court should suppress statements Defendant Lamont made after he invoked his right to remain silent.

RESPECTFULLY SUBMITTED this 12ᵗ day of June, 2019.

/s/ Clayton Simms, Attorney for Defendant

CERTIFICATE OF DELIVERY

      I hereby certify that a true and correct copy of the foregoing **MOTION TO SUPPRESS: MIRANDA** was provided electronically to all parties named below on this 12th day of June, 2019:


U.S. Attorney's Office
Aaron Flater
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111


    /s/    Clayton Simms